# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BURKE/CROSBY, Minors.

UNPUBLISHED
June 7, 2018

No. 341391
Wayne Circuit Court
Family Division
LC No. 15-519130-NA

*In re* K. D. CROSBY, JR., Minor.

No. 341734
Wayne Circuit Court
Family Division
LC No. 15-519130-NA

Before: SERVITTO, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

The circuit court terminated respondent-mother's parental rights to her two young children, and respondent-father's rights to their shared son, following 33 months of services (and an additional year of Child Protective Services assistance before court intervention). Despite this assistance, mother completely failed to rectify the condition that led to adjudication—her severe, untreated mental illness—and therefore would not be able to provide proper care and custody in a safe home within a reasonable time. While father completed services and worked hard to financially support his son, he never secured a home into which he could safely bring his son, failed to attend his son's therapeutic services to become educated about the child's special needs, and attended only half of all available parenting time sessions. Although the Department of Health and Human Services did not always fulfill its duties to the utmost, on this record we discern no error in the termination decisions. We affirm.

## I. FACTUAL BACKGROUND

Mother gave birth to the parties' son, KC, on January 11, 2012. In March 2014, Child Protective Services (CPS) intervened with the family. Mother was incarcerated and left KC with her mother, who was unwilling to care for the toddler. CPS placed KC with father. Mother spent three months in jail and then approximately one week in a mental institution. Upon mother's release, she appeared at father's home while he was at work. KC's babysitter released the child to mother without father's consent.

-1-

On June 11, 2014, police were summoned to mother's home because KC was found wandering the street alone. CPS allowed KC to remain in mother's care with in-home assistance from Family's First. Mother completed these preventative services on September 16, 2014.

On February 26, 2015, CPS received another complaint after KC was again found unsupervised. When the police located mother, she was incoherent and wandering outside her apartment complex without a coat or shoes. The following day, CPS removed KC from mother's care, placed him with non-relatives, and filed a petition seeking jurisdiction over the child. The Department of Health and Human Services (DHHS) considered father for placement but he was living with relatives and had neither room nor a bed for the child.

A month later, mother gave birth to a daughter, NB. After the birth, mother was incoherent and unaware of her surroundings. Hospital staff secured a psychiatric consult and CPS took NB into protective custody. The infant was placed in non-relative care separate from her brother. Mother went immediately into psychiatric care after her maternity ward release and was eventually diagnosed with schizoaffective disorder, mood disorder, and delirium confusion. She was prescribed antipsychotic medication.

In the months that followed, mother was in and out of psychiatric institutions. The court ordered the DHHS to step up its services to her, but the caseworker repeatedly failed in this regard. Eventually, the children's GAL requested a show cause, the court fined the agency $1,000 and continued the proceedings for nearly another year. Thereafter, the probate court appointed a guardian for mother and the DHHS assigned a parent partner. However, mother declined to stay in contact with either her guardian or parent partner and went missing for months at a time. Mother refused to take her psychotropic medication, relying instead on marijuana. The DHHS made 10 referrals for parenting classes, seven for therapy, six for substance abuse treatment, and two for drug screens. Mother barely participated, completed only her psychiatric and psychological evaluations, and eventually stopped visiting her children.

Father did attend counseling and parenting classes. He worked seven days a week for a security company, paying down a child support arrearage and other debts. Father's main obstacle was his lack of suitable housing. During the 33-month proceedings, father lived in six different places. By the time of the termination hearing, father was living in a home with an unsecured handgun and no food to be found. Father promised to remedy those conditions.

Because of father's hectic work schedule, he attended only 87 of 156 available parenting time sessions. In the beginning, father bonded well with KC and he earned unsupervised parenting time in the community. However, toward the end of the proceedings, KC started full-day school and father, who worked afternoons, went four months without seeing his son. KC told his foster father that he was his "real dad" and told his therapist that father "did not want" him.

Moreover, during the child protective proceedings, KC was diagnosed with fetal alcohol syndrome, post-traumatic stress disorder, attention deficit hyperactivity disorder, and oppositional defiant disorder. He was developmentally and academically delayed. KC's psychiatrist recommended medication. Father, however, refused to sign the required paperwork

to begin this treatment. Despite that father declined to attend any of KC's myriad appointments, father insisted that he observed no problems with his child requiring medication.

Based on this evidence, the circuit court terminated mother's parental rights to both children pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j), and father's parental rights to KC pursuant to MCL 712A.19b(3)(g) and (j).

## II. REASONABLE EFFORTS

Both respondents argue that the DHHS made insufficient efforts to reunite the family. We review for clear error a trial court's determination that reasonable efforts have been made. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). Before a court may contemplate termination of a parent's rights, the petitioner must make reasonable efforts to reunite the family. MCL 712A.19a(2). "The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights. *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009). However, a respondent also has a responsibility to participate in the services offered. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

Mother contends that the DHHS should have provided more intensive services given her severe mental illness. In *In re Hicks/Brown*, 500 Mich 79; 893 NW2d 637 (2017), our Supreme Court considered whether the DHHS made reasonable efforts to reunify an intellectually disabled parent with her children. The Court considered obligations arising under both the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, and the Michigan Probate Code, MCL 712A.18f(3)(d). Under the Probate Code, "the [DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *Hicks/Brown*, 500 Mich at 85. The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* at 86 (citation omitted). The Court held that the DHHS neglects its duty under the ADA to reasonably accommodate a disability when it fails to implement reasonable modifications to services or programs offered to a disabled parent. *Id*. Similarly, the Court stated that "efforts at reunification cannot be reasonable under the Probate Code if the [DHHS] has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *Id*.

In the beginning of these proceedings, the DHHS did not make reasonable efforts to accommodate mother's disability so she could work toward reunification with her children. However, this shortfall was remedied by the court. Mother was given another year of services. At the court's prompting, mother was appointed a guardian and assigned a parent partner to help her through the service plan. But mother insisted that she did not need to take psychotropic medication to control her schizoaffective disorder. She ran off to Colorado to become an Uber driver. When mother returned, she lived in a care facility but then moved in with her mother against her doctor's advice. The guardian and parent partner tried to work with mother, but mother would not reciprocate. And despite numerous service referrals, mother was completely noncompliant. There was nothing more the DHHS could do to promote mother's success.

Father contends that the DHHS should have provided additional services to help him find housing. The record shows, however, that the DHHS actually provided adequate services in this regard. The caseworker provided referrals and housing lists, and sent recommendations on father's behalf to the housing commissions. As father's earnings increased, his income became too high to qualify for low-income housing. Further, father's poor credit history was a roadblock to obtaining housing. Father failed to substantiate any of his efforts to follow up on the leads provided by the caseworker. Accordingly, we discern no ground for relief.

## III. STATUTORY GROUNDS

Both respondents argue that the circuit court erred in finding statutory grounds to terminate their parental rights. Pursuant to MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" that at least one statutory ground has been proven by the DHHS. MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). We review a circuit court's factual finding that a statutory termination ground has been established for clear error. *Rood*, 483 Mich at 90-91. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted). "Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

In terminating mother's parental rights to KC and NB, the court cited MCL 712A.19b(3)(c)(*i*), (g), and (j), which provide:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

-4-

The court relied only on factors (g) and (j) when terminating father's rights.

Termination of mother's rights was supportable under all cited factors. The children were brought into care because mother's severe mental illness. Her failure to treat her condition rendered her unable to provide proper care and custody for her children and to keep them safe. Throughout the 33-month proceedings, mother insisted that she did not need to take psychotropic medication to control her mental illness. Yet mother was repeatedly hospitalized in psychiatric institutions. She continued to make rash spending decisions and travelled to Colorado with a boyfriend in the hopes of becoming an Uber driver, only to be abandoned. Even 33 months later, mother asserted that she could control her illness without medication or counseling. Accordingly, mother did not rectify the conditions that led to adjudication and would not be able to do so within a reasonable time. Given mother's denial of the reality of her condition, the record also supports that she would be unable to provide proper care or custody within a reasonable time and that the children faced a high likelihood of harm if returned to her care.

The record also supports the termination of father's parental rights. The DHHS consistently cited housing as the main barrier to KC's reunification with father. To that end, the caseworker provided father housing referrals and recommendations. Despite being gainfully employed, earning enough that he did not qualify for low-income housing, father was still unable to secure suitable housing. The court did not base its termination decision on father's inability to secure suitable housing, however. Instead, the court noted that although father participated in reunification services, he did not show adequate benefit.

Father did not take advantage of the parenting time granted to him. He frequently told the caseworker that he missed visits because of his work schedule. Of the 156 visits offered, father attended only 87. The DHHS offered father extended unsupervised parenting time in the community and even overnight visits, but father never exercised those rights. Then, between August 21and December 4, 2017, father did not visit KC at all.

Father also failed to participate in KC's psychiatric and therapy appointments. KC was diagnosed with fetal alcohol syndrome, PTSD, ADHD, and ODD. He demonstrated aggressive behaviors, did not get along with his peers, and disrupted the classroom. KC needed a lot of attention and redirection and would require long-term educational and therapeutic services. The caseworker frequently impressed upon father the importance of attending KC's treatment so that he could learn how to respond to KC's behavioral issues. Father, however, did not make time to participate in these appointments.

KC's psychiatrist recommended that KC be administered medication, but father would not consent to this treatment. He dismissed KC's behavioral issues as a product of being separated from his father. Based on questioning by the referee at the termination hearing, it was clear that father did not accept that his child had a psychiatric diagnosis and that this diagnosis required treatment. Indeed, it was abundantly clear that father would not be an advocate for his son and seek the medical treatment he will require. Given this evidence, the court did not clearly err in finding that father would be unable to provide proper care and custody and to safely parent his special needs child within a reasonable time.

# IV. BEST INTERESTS

Respondents argue that the circuit court clearly erred in finding that termination of their parental rights was in the children's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *Moss*, 301 Mich App at 90. The court should weigh all the evidence available to it in determining the child's best interests. *Trejo*, 462 Mich at 356-357. Relevant factors include "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality. . . ." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, [and] the children's well-being while in care. . . ." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). The advantages of the child's foster placement over placement with the parent are a relevant consideration. *In re Foster*, 285 Mich App 630, 634-635; 776 NW2d 415 (2009). The court may also consider the likelihood that "the child could be returned to her parent's home within the foreseeable future, if at all." *Frey*, 297 Mich App at 248-249. At this stage in the proceedings, the best interests of the child in having "a normal family home is superior to any interest the parent has." *Moss*, 301 Mich App at 89.

Termination of mother's parental rights was clearly in the best interests of her children. Mother had no bond with young NB. During visits, mother could not handle the baby alone and often asked the caseworker or foster mother to intercede. NB has been in the same foster home since birth and her foster parents wish to adopt. Given mother's mental health issues and failure to participate in treatment, it is unlikely that NB could ever be returned to her care.

Mother did initially share a strong bond with KC. As time wore on, however, mother's paranoia and scattered mood interfered with that relationship. At one visit, mother scared KC by strip searching him. Ultimately, mother stopped attending visits for long periods, eroding KC's memory of his parent. KC's foster parents also wished to adopt and had shown success in handling the child's special needs. Under these circumstances, we discern no error in the court's termination of mother's parental rights.

The record shows that father also initially shared a strong bond with KC. The caseworker noted, however, that KC viewed father as a playmate rather than a parent figure. KC told his foster father that he was his "real dad." Most importantly, father refused to believe that his son had special needs. Even before father stopped attending visits, then three-year-old KC was operating at the level of a 19-month-old child. But father declared that KC was developmentally on track and showed no signs of impairment. Given father's denial, it is unlikely that he would appropriately address KC's needs. As noted, KC's needs were being adequately addressed in his

foster home, a home into which KC can be adopted. On this record, termination of father's parental rights was in KC's best interests.

We affirm.

/s/ Deborah A. Servitto
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens